## WATER POWER CASES.

STATE EX REL. WAUSAU STREET RAILROAD COMPANY vs. BANCROFT, Attorney General, and others.

STATE EX REL. JACKSON MILLING COMPANY vs. SAME.

STATE EX REL. NEKOOSA-EDWARDS PAPER COMPANY vs. SAME.

STATE EX REL. KOENIG and another vs. SAME.

STATE EX REL. SOUTHERN WISCONSIN POWER COMPANY vs. SAME.

STATE EX REL. CHIPPEWA VALLEY RAILWAY, LIGHT & POWER COMPANY and another vs. SAME.

*December 12, 1911—January 30, 1912.*

*Equity: Injunction: Confiscation or destruction of property: Invalid statute: Public wrong: Supreme court: Original jurisdiction: Navigable rivers: Authorized dams: Control: Sovereignty of state: Ownership of water powers: Charters: Reserved power of repeal: Eminent domain: Taking of private property: Just compensation: Due process of law: Riparian rights: Regulation: Legislative power: Declaring property a nuisance, or use a public use: Judicial questions: Statutes: Partial invalidity.*

1. An averment that property in the possession of complainant is threatened with destruction or confiscation by unwarranted statutory declaration that it is a public nuisance and by the imposition of penalties for the use of such property, sets forth a private wrong calling for the interposition of equity *quia timet* against ministerial officers charged with the execution of the statute.

2. Where it is averred that all improvements to navigation constructed under former statutes and existing in the navigable rivers of the state are still recognized as such improvements by a new statute, but also by the latter declared to be public nuisances and threatened with abatement and destruction, and their maintenance, use, and up-keep penalized except upon conditions plausibly charged to be invalid and unenforceable, a threatened public wrong affecting the sovereign prerogatives of the state and calling for prevention by injunction is sufficiently averred.

3. In the case last cited the supreme court will exercise its original jurisdiction.

4. A statute declaring that all energy, developed or undeveloped, of the navigable waters of the state is subject to the control of the state for the public good, that the beneficial use and natural energy of the navigable waters of the state for all public uses are held by the state in trust for all the people, should be sustained as an assertion of the sovereignty of the state and the power of regulation instead of an assertion of proprietorship, especially when such construction is essential to uphold the statute.

5. The reserved power of repeal of charters contained in the constitution or in a charter must be construed so as to harmonize it with other commands and restrictions contained in the constitution, and it does not authorize the taking without compensation of the physical property acquired under said charter. This reserved power of repeal is also subject and subordinate to the provisions of the federal constitution which forbid the state to deprive any person of life, liberty, or property without due process of law and to the substantial equivalent of the latter contained in the state constitution.

6. Where a charter reserving therein no right of repeal is granted to a natural person, authorizing the construction of a dam in a navigable river in aid of navigation and accepted by such grantee by construction of the required dam, the charter is not repealable at the pleasure of the legislature; but before acceptance it is so repealable. When such charter is granted to a natural person, reserving to the state a right of repeal, or where it is granted to a corporation, and in either case accepted by construction of the required improvement, while there exists the power of repeal this does not include confiscation or destruction of any property which can exist notwithstanding the repeal, but all such property is protected by the usual constitutional guaranties applicable to other property.

7. Sec. 1596, Stats. (Laws of 1911, ch. 652), is prospective only in its operation and, so far as it refers to streams not theretofore within the purview of the statute it purports to amend, it affects only dams, etc., placed in such streams after the act of 1911 went into effect.

8. The right to use the water of a navigable river for the creation or development of power upon his own land is a riparian right appurtenant to the riparian land and belongs to the owner of such land. The *quasi*-private ownership of the bed of a navigable river and all incorporeal riparian rights are subject and subordinate to the public right of navigation, but not so the

ownership of the bank. Where the ownership of the bank is necessary for the construction of a dam in aid of navigation the state is powerless to construct or authorize the construction of such dam without the consent of the riparian owner or expropriation with compensation to such owner, and the riparian owner is powerless to obtrude a dam into such navigable waters without the consent of the state. Where by joint consent of the riparian owner and of the state the riparian owner constructs such dam at his expense in aid of navigation, the consideration moving to the state is the improvement of the navigation and to the riparian owner is the creation or development of the water power. This water power and the right of the riparian owner thereunto does not in such case conflict with the public right of navigation, but is rather promotive of such right, and it continues to be a riparian right as before and the private property of the riparian owner subject to regulation by the state to a degree commensurate with its character and situation. It is in no sense the property of the state. Whether one person or another owns this resulting water power is not material to the interests of navigation.

9. An act of the legislature which forbids any person to conduct or maintain or operate or use any dam or other improvements in or across any navigable stream without a franchise; which defines the word "franchise" to be one obtained under the act; which defines the word "improvements" as used in the act to include much valuable property including the riparian land; which declares such dam and "improvements" a public nuisance subject to abatement as such and penalizes the use and maintenance of such property,—constitutes, as regards owners of formerly authorized dams, a taking of the property, if in order to obtain a franchise under the act in question the owner of the property is obliged to consent to the surrender of valuable property rights belonging to him.

10. The legislature cannot conclusively declare property existing at the time the statute goes into effect a public nuisance and penalize the use and enjoyment thereof.

11. The legislature has no power to conclusively declare that a given use of property is a public use.

12. The matters covered by the two preceding paragraphs present judicial questions, for otherwise the legislature could confiscate property without making compensation.

13. The act in question by declaring the property a public nuisance, providing for its abatement, and penalizing its use conditionally; and without any physical change in the property or its condition recognizing it as a lawful structure in aid of naviga-

tion, and allowing it to remain on condition that some other person apply for it or that the owner relinquish valuable property rights without compensation and make certain payments to the state, operates to deprive such owner of his property without due process. of law, unless just compensation to such owner is provided.

14. The just compensation required by the constitution is not provided by permitting compensation only if some one at some indefinite time after the taking shall appear and want the property in question.

15. The just compensation required by the constitution is not provided by a statute limiting the compensation to be awarded so as to exclude all increase in value of the property after a given date long prior to the taking.

16. Neither is such compensation provided where a riparian owner, having no dam or charter for a dam, is for a taking of the bank not allowed the full value of his riparian rights, including the use of water for power purposes and the advantage which the land presents for creating a water power by construction of a dam; nor is such compensation provided where a riparian owner who has lawfully constructed a dam and owns the resulting water power, but whose charter to maintain the dam is repealed, is not allowed to recover the value of his water power thus improved and in that condition.

17. To declare property a public nuisance, provide for its abatement, and penalize its use without making compensation, but at the same time permitting the owner to obviate these consequences by applying for and obtaining a franchise under which he must consent that his hitherto private property be impressed with a public use, that after a stated interval some other person may take the property for a private use, that the state or a municipality may take it for a public use, and that in the latter case he forego part of the compensation required by the constitution and pay a franchise fee to the state, is depriving such owner of his property without due process of law contrary to the federal constitution, and is invalid legislation under the state constitution as well.

18. Private property taken by one who has the right to use so much thereof as may be reasonably necessary for his own purpose or purposes is taken for a private use.

19. In order for part of an act to be upheld as separable it is essential that such part found to be within the constitutional power of the legislature forms, independently of the invalid portions, a complete law in some reasonable aspect so that it may fairly be concluded that the legislature would have enacted the same

without the invalid portion. Where a legislative enactment has an all-pervading purpose coupled with minor details and administrative features and this purpose is unconstitutional, such minor details and administrative features cannot survive condemnation of the main purpose.

[Syllabus by TIMLIN, J.]

A SERIES of suits, as above indicated, involving the validity of ch. 652, Laws of 1911, was brought in this court against *Levi H. Bancroft*, Attorney General, *James A. Frear*, Secretary of State, *Andrew H. Dahl*, State Treasurer, and the *Railroad Commission*, consisting of *John H. Roemer, Halford Erickson*, and *David Harlowe*. When leave to bring these suits was granted, the question of the jurisdiction of this court to entertain the suits was expressly reserved.

On behalf of the relators there were briefs signed by *B. R. Goggins*, attorney for *Wausau Street Railroad Company, Jackson Milling Company, Nekoosa-Edwards Paper Company*, and *R. P.* and *Geo. Koenig*, by *Burr W. Jones*, attorney for *Southern Wisconsin Power Company*, by *Bundy & Wilcox*, attorneys for *Chippewa Valley Railway, Light & Power Company* and *Northwestern Steel & Iron Works*, and by *Moses Hooper, Neal Brown, D. Buchanan, Geo. P. Hambrecht*, and *B. L. Parker*, of counsel; a brief on the question of jurisdiction by *B. R. Goggins*, attorney for plaintiffs, and *Moses Hooper, Neal Brown, D. Buchanan, Geo. P. Hambrecht, Burr W. Jones*, and *B. L. Parker*, of counsel; a supplemental brief by *Bundy & Wilcox*, attorneys for *Chippewa Valley Railway, Light & Power Company* and *Northwestern Steel & Iron Works*, and *Wm. Ruger*, of counsel; a supplemental brief by *Jones & Schubring*, attorneys for *Southern Wisconsin Power Company;* a brief by *Tyler & Young* and *Sanborn & Blake* as *amici curiæ;* a brief by *Rome G. Brown* as *amicus curiæ;* and a brief on behalf of the city of Eau Claire by *Arthur H. Shoemaker*, corporation counsel. The cause was argued orally on this side by *B. R. Goggins, Burr*

*W. Jones, Wm. Ruger, C. T. Bundy, Neal Brown, Geo. P. Hambrecht, B. L. Parker,* and *Moses Hooper.*

For the relators there were cited, among other authorities, the following: Resolution of Congress of October 10, 1780; Act of Congress of September 12, 1783; Resolution of March 1, 1784; Acts of April 20, 1836, August 6, 1848, and May 13, 1848; Acts and Resolutions of Virginia Legislature of Jan. 2, 1781, October 20, 1783, and March 1, 1784; Ordinance of 1787, art. 4; Act establishing the Territory of Wisconsin, secs. 6, 9, 12; Const. sec. 2, art. II, and sec. 13, art. XIV; Ratification by Virginia, December 30, 1788, of the Ordinance of 1787; *Huber v. Markel,* 117 Wis. 355, 94 N. W. 354; *Head v. Amoskeag Mfg. Co.* 113 U. S. 9, 5 Sup. Ct. 441; *Wurts v. Hoagland,* 114 U. S. 606, 5 Sup. Ct. 1086; Laws of 1849, ch. 212, sec. 8; R. S. 1858, ch. 28, sec. 24; R. S. 1878, secs. 135, 195, 1052; Laws of 1901, ch. 95; Laws of 1909, ch. 374; Laws of 1907, ch. 335; Laws of 1911, chs. 591 and 640 (proposed constitutional amendment of 1911); Laws of 1911, pp. 1152–53; Laws of 1853, ch. 72; *Spensley v. Valentine,* 34 Wis. 154; *Smith v. Ford,* 48 Wis. 115, 2 N. W. 134, 4 N. W. 462; *Jones v. Soulard,* 65 U. S. 41; *Propeller Genesee Chief v. Fitzhugh,* 53 U. S. 443; *Jones v. Pettibone,* 2 Wis. 308; *Walker v. Shepardson,* 4 Wis. 486; *Mariner v. Schulte,* 13 Wis. 692; *Arnold v. Elmore,* 16 Wis. 509; *Wis. River Imp. Co. v. Lyons,* 30 Wis. 61; *Olson v. Merrill,* 42 Wis. 203, 211; *Green Bay & M. C. Co. v. Kaukauna W. P. Co.* 70 Wis. 635, 35 N. W. 529, 36 N. W. 828; *Koenig v. Watertown,* 104 Wis. 409, 80 N. W. 728; *Kimberly & C. Co. v. Hewitt,* 79 Wis. 334, 48 N. W. 373; *West v. Fox River P. Co.* 82 Wis. 647, 52 N. W. 803; *Fox River F. & P. Co. v. Kelley,* 70 Wis. 267, 35 N. W. 744; *Kaukauna W. P. Co. v. Green Bay & M. C. Co.* 75 Wis. 385, 44 N. W. 638; *A. C. Conn Co. v. Little Suamico L. Mfg. Co.* 74 Wis. 652, 43 N. W. 660; *Wis. River Imp. Co. v. Pier,*

137 Wis. 325, 118 N. W. 857; *Blanchard v. Doering*, 21 Wis. 477; *Samuels v. Blanchard*, 25 Wis. 329; *Clark v. Plummer*, 31 Wis. 442; *Lawson v. Mowry*, 52 Wis. 219, 9 N. W. 280; *Clark v. Stewart*, 56 Wis. 154, 14 N. W. 54; *Valley P. & P. Co. v. West*, 58 Wis. 599, 17 N. W. 554; *Mack v. Bensley*, 74 Wis. 112, 42 N. W. 215; *Pioneer W. P. Co. v. Chandos*, 78 Wis. 526, 47 N. W. 661; *Janesville C. Mills v. Ford*, 82 Wis. 416, 52 N. W. 764; *Jackson M. Co. v. Chandos*, 82 Wis. 437, 52 N. W. 759; *Falls Mfg. Co. v. Oconto River Imp. Co.* 87 Wis. 134, 58 N. W. 257; *Green Bay & M. C. Co. v. Kaukauna W. P. Co.* 90 Wis. 370, 61 N. W. 1121, 63 N. W. 1019; *Appleton P. & P. Co. v. Kimberly & C. Co.* 100 Wis. 195, 75 N. W. 889; *Consolidated W. P. Co. v. Nash*, 109 Wis. 490, 85 N. W. 485; *Green Bay & M. C. Co. v. Telulah P. Co.* 140 Wis. 417, 122 N. W. 1062; *Holyoke W. P. Co. v. Conn. River Co.* 20 Fed. 71; *Kaukauna W. P. Co. v. Green Bay & M. C. Co.* 142 U. S. 254, 12 Sup. Ct. 173; *U. S. v. Great Falls Mfg. Co.* 112 U. S. 645, 5 Sup. Ct. 306; *Great Falls Mfg. Co. v. Att'y Gen.* 124 U. S. 581, 8 Sup. Ct. 631; *U. S. v. Rio Grande D. & I. Co.* 174 U. S. 690, 19 Sup. Ct. 770; *State ex rel. N. P. R. Co. v. Railroad Comm.* 140 Wis. 145, 121 N. W. 919; *Close v. Glenwood Cemetery*, 107 U. S. 466, 2 Sup. Ct. 267; *New York & N. E. R. Co. v. Bristol*, 151 U. S. 556, 14 Sup. Ct. 437; *Holyoke Co. v. Lyman*, 15 Wall. 500, 522; *Madison, W. & M. P. Co. v. Reynolds*, 3 Wis. 287; *Huber v. Martin*, 127 Wis. 412, 105 N. W. 1031, 1135; *Little Chute v. Van Camp*, 136 Wis. 526, 117 N. W. 1012; *Att'y Gen. v. Railway Cos.* 35 Wis. 425; *Att'y Gen. v. Eau Claire*, 37 Wis. 400; *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 440, 51 N. W. 724; *State ex rel. Att'y Gen. v. Frost*, 113 Wis. 623, 88 N. W. 912, 89 N. W. 915; *State ex rel. Lamb v. Cunningham*, 83 Wis. 90, 53 N. W. 35; *In re Court of Honor*, 109 Wis. 625, 85 N. W. 497; *State ex rel. Anderson v. Timme*, 70 Wis. 627, 36 N. W. 325; *State ex rel. Bell v. Harshaw*, 76 Wis. 230, 45 N. W.

398; *State ex rel. Rosenhein v. Frear,* 138 Wis. 173, 119 N. W. 894; *State ex rel. Cook v. Houser,* 122 Wis. 534, 100 N. W. 964; *Wis. W. Co. v. Winans,* 85 Wis. 26, 54 N. W. 1003; *Charnley v. Shawano W. P. & R. Imp. Co.* 109 Wis. 563, 85 N. W. 507; *Rossmiller v. State,* 114 Wis. 169, 89 N. W. 839; *Eastern Wis. R. & L. Co. v. Hackett,* 135 Wis. 464, 115 N. W. 376, 1136, 1139; *W. U. Tel. Co. v. Pennsylvania R. Co.* 195 U. S. 540, 25 Sup. Ct. 133; *Interstate Comm. Comm. v. C. G. W. R. Co.* 209 U. S. 108, 28 Sup. Ct. 493; *Norcross v. Griffiths,* 65 Wis. 599, 27 N. W. 606; *Gratz v. Land & R. I. Co.* 82 Fed. 381; *Janesville v. Carpenter,* 77 Wis. 288, 46 N. W. 128; *Willow River Club v. Wade,* 100 Wis. 86, 76 N. W. 273; *Kelley v. Salvas,* 146 Wis. 543, 131 N. W. 436; *Papworth v. Milwaukee,* 64 Wis. 389, 25 N. W. 431; *Kansas N. G. Co. v. Haskell,* 172 Fed. 545; *Yates v. Milwaukee,* 10 Wall. 497; *Stevens Point B. Co. v. Reilly,* 44 Wis. 295; *In re Southern Wis. P. Co.* 140 Wis. 245, 122 N. W. 801; *Sellers v. Union L. Co.* 39 Wis. 525; *Wis. River Imp. Co. v. Manson,* 43 Wis. 255; *State ex rel. Zillmer v. Kreutzberg,* 114 Wis. 530, 90 N. W. 1098; *State v. Redmon,* 134 Wis. 89, 114 N. W. 837; *Bonnett v. Vallier,* 136 Wis. 193, 116 N. W. 885; *Dartmouth College v. Woodward,* 4 Wheat. 518; *State ex rel. Board of Ed. v. Haben,* 22 Wis. 660; *Mills v. Charleton,* 29 Wis. 400; *Wahlschlager v. Liberty,* 23 Wis. 362; *Railroad Co. v. Ellerman,* 105 U. S. 166; Act of Congress of July 26, 1866, ch. 26 (2 U. S. Comp. Stats. 1901, p. 1437); *Boquillas L. & C. Co. v. Curtis,* 213 U. S. 339, 29 Sup. Ct. 493; *U. S. v. Chandler-Dunbar W. P. Co.* 209 U. S. 447, 28 Sup. Ct. 579; *St. Anthony Falls W. P. Co. v. St. Paul W. Comm'rs,* 168 U. S. 349, 18 Sup. Ct. 157; *Packer v. Bird,* 137 U. S. 661, 11 Sup. Ct. 210; *Fallbrook I. Dist. v. Bradley,* 164 U. S. 112, 17 Sup. Ct. 56; *Hardin v. Jordan,* 140 U. S. 371, 11 Sup. Ct. 808, 838; *Broder v. Water Co.* 101 U. S. 274; *Grand Rapids & I. R. Co. v. Butler,* 159 U. S. 87, 15 Sup. Ct. 991; *Franzini v. Layland,* 120 Wis. 72,

97 N. W. 499; *Rundle v. Delaware & R. C. Co.* 14 How. 80; *Ill. Cent. R. Co. v. Illinois,* 146 U. S. 387, 13 Sup. Ct. 110; *Union B. Co. v. U. S.* 204 U. S. 364, 27 Sup. Ct. 367; *Chicago, B. & Q. R. Co. v. People ex rel. D. Comm'rs,* 200 U. S. 561, 26 Sup. Ct. 341.

On the part of the defendants there was a brief signed by the *Attorney General* and *Russell Jackson,* deputy attorney general, and by *George Lines, Theodore Kronshage, Jr.,* and *Walter D. Corrigan,* of counsel; also a brief by *Paul Husting* as *amicus curiæ;* and the cause was argued orally by *Mr. Jackson, Mr. Lines, Mr. Corrigan,* and *Mr. Husting.* They cited, among other authorities, the following: *Chicago, M. & St. P. R. Co. v. State,* 53 Wis. 509, 10 N. W. 560; *Fitts v. McGhee,* 172 U. S. 516, 19 Sup. Ct. 269; *Ex parte Ayers,* 123 U. S. 443, 8 Sup. Ct. 164; *Morenci C. Co. v. Frear,* 127 Fed. 199; *Union T. Co. v. Stearns,* 119 Fed. 790; *Arbuckle v. Blackburn,* 113 Fed. 616; *Boise A. H. & C. W. Co. v. Boise City,* 213 U. S. 276, 29 Sup. Ct. 426; *Cohn v. Wausau B. Co.* 47 Wis. 314, 2 N. W. 546; *State ex rel. Kellogg v. Currens,* 111 Wis. 431, 87 N. W. 561; *Strange v. Oconto L. Co.* 136 Wis. 516, 117 N. W. 1023; *Benz v. Kremer,* 142 Wis. 1, 125 N. W. 99; *Wadhams Oil Co. v. Tracy,* 141 Wis. 150, 123 N. W. 785; *State ex rel. Buell v. Frear,* 146 Wis. 291, 131 N. W. 832; *Allaby v. Mauston E. S. Co.* 135 Wis. 345, 116 N. W. 4; *Whisler v. Wilkinson,* 22 Wis. 572; *Sellers v. Union L. Co.* 39 Wis. 525; *East Hartford v. Hartford B. Co.* 10 How. 511; *State ex rel. Drake v. Doyle,* 40 Wis. 175; *State ex rel. Covenant Mut. Ben. Asso. v. Root,* 83 Wis. 667, 54 N. W. 33; *In re Eldred,* 46 Wis. 530, 1 N. W. 175; *Shively v. Bowlby,* 152 U. S. 1, 14 Sup. Ct. 548; *Barney v. Keokuk,* 94 U. S. 324; *Eldridge v. Trezevant,* 160 U. S. 452, 16 Sup. Ct. 345; *McLennan v. Prentice,* 85 Wis. 427, 55 N. W. 764; *Priewe v. Wis. S. L. & I. Co.* 93 Wis. 534, 67 N. W. 918; *Att'y Gen. ex rel. Askew v. Smith,* 109 Wis. 532, 85 N. W. 512; *Ill. S. Co. v. Bilot,* 109 Wis. 418, 84 N. W. 855, 85

N. W. 402; *Pewaukee v. Savoy,* 103 Wis. 271, 79 N. W. 436; *Scranton v. Wheeler,* 179 U. S. 141, 21 Sup. Ct. 48; *Tewksbury v. Schulenberg,* 41 Wis. 584; *Delaplaine v. C. & N. W. R. Co.* 42 Wis. 214; *Harrington v. Edwards,* 17 Wis. 586; *Yates v. Judd,* 18 Wis. 118; *Boorman v. Sunnuchs,* 42 Wis. 233; *J. S. Keator L. Co. v. St. Croix B. Corp.* 72 Wis. 62, 38 N. W. 529; *Pollard's Lessee v. Hagan,* 3 How. 212; *Gilman v. Philadelphia,* 3 Wall. 713; *Stockton v. B. & N. Y. R. Co.* 32 Fed. 9; *Salliotte v. King B. Co.* 122 Fed. 378; *Manigault v. Springs,* 199 U. S. 473, 26 Sup. Ct. 127; *Noble State Bank v. Haskell,* 219 U. S. 104, 31 Sup. Ct. 186; *Munn v. Illinois,* 94 U. S. 113; *Borgnis v. Falk Co.* 147 Wis. 327, 133 N. W. 209; *Newcomb v. Smith,* 2 Pin. 131; *Pratt v. Brown,* 3 Wis. 603; *Fisher v. Horicon I. & M. Co.* 10 Wis. 351; *Walker v. Shasta P. Co.* 160 Fed. 856; *Hackett v. Ottawa,* 99 U. S. 86; *Blair v. Cuming Co.* 111 U. S. 363, 4 Sup. Ct. 449; *Burlington Tp. v. Beasley,* 94 U. S. 310; *Charlotte, C. & A. R. Co. v. Gibbes,* 142 U. S. 386, 12 Sup. Ct. 255; *Georgia R. & B. Co. v. Smith,* 128 U. S. 174, 9 Sup. Ct. 147; *Cawker v. Meyer,* 147 Wis. 320, 133 N. W. 157; *Union L. Co. v. Railroad Comm.* 144 Wis. 523, 129 N. W. 605; *Hudson Co. W. Co. v. McCarter,* 209 U. S. 349, 28 Sup. Ct. 529; *Bacon v. Walker,* 204 U. S. 311, 27 Sup. Ct. 289; *Bittenhaus v. Johnston,* 92 Wis. 588, 66 N. W. 805; *Barbier v. Connolly,* 113 U. S. 27, 5 Sup. Ct. 357; *Propeller Genesee Chief v. Fitzhugh,* 12 How. 443; *The Daniel Ball,* 10 Wall. 557; sec. 1596, Stats. (1898); 30 U. S. Stats. at Large, 1151, sec. 9 (6 Fed. Stats. Ann. 605); *Enos v. Hamilton,* 24 Wis. 658; *Chapin v. Crusen,* 31 Wis. 209; *Pennsylvania College Cases,* 13 Wall. 190; *Mumma v. Potomac Co.* 8 Pet. 281; *Greenwood v. Freight Co.* 105 U. S. 13; *Sinking Fund Cases,* 99 U. S. 700; *Calder v. State ex rel. Att'y Gen.* 218 U. S. 591, 31 Sup. Ct. 122; *West Wis. R. Co. v. Trempealeau Co.* 35 Wis. 257; *State ex rel. Cream City R. Co. v. Hilbert,* 72 Wis. 184, 39 N. W. 326; *Proprietors v. Proprietors,* 11 Pet. 420;

*Fletcher v. Peck,* 6 Cranch, 87; *Sunset T. & T. Co. v. Medford,* 115 Fed. 202; *Hatch v. Lusignan,* 117 Wis. 428, 94 N. W. 332; *Kahn v. Lesser,* 97 Wis. 217, 72 N. W. 739; *Railroad Co. v. Schurmeir,* 7 Wall. 272; *Wright v. Day,* 33 Wis. 260; *Oborn v. State,* 143 Wis. 249, 126 N. W. 737; *Ex parte Young,* 209 U. S. 123, 28 Sup. Ct. 441; *Quiggle v. Herman,* 131 Wis. 379, 111 N. W. 479; *Blackstone v. Miller,* 188 U. S. 189, 23 Sup. Ct. 277; *Ambrosini v. U. S.* 187 U. S. 1, 23 Sup. Ct. 1; *State ex rel. Att'y Gen. v. Norcross,* 132 Wis. 534, 112 N. W. 40; *Rundle v. Delaware & R. C. Co.* 14 How. 80, 91; *Black River Imp. Co. v. La Crosse B. & T. Co.* 54 Wis. 659, 11 N. W. 443; sec. 1, art. II, Const.; *Weber v. Board of Harbor Comm'rs,* 18 Wall. 57; *Tyler v. Wilkinson,* 4 Mason, 397; *McCready v. Virginia,* 94 U. S. 391.

TIMLIN, J.    The statute in question is entitled "An act to amend section 1596, and to create section 1596a of the Statutes, relating to the construction and maintenance of dams in or across navigable waters, and to create sections 1596—1 to 1596—76, both inclusive, of the Statutes, relating to the granting of franchises authorizing the improvement of navigation and the development of hydraulic power created by such improvement, providing for a franchise fee therefor, and making an appropriation."

In this opinion the sections of this act will be referred to as secs. 1596, 1596a, and by the subsection numbers 1 to 76.

Epitomized, the act in question presents a comprehensive plan by which all existing dam charters capable of repeal are repealed, and henceforward the matter of new charters for dams in navigable waters is committed to the *Railroad Commission* to determine the facts, issue certificates, make and enforce conditions, exercise supervision, etc.    Upon the finding of the *Commission* that the requisite facts do not exist, a franchise is refused.    Upon the *Commission's* finding of the existence of the requisite facts, the statute grants a franchise

imposing conditions hereinafter referred to, which franchise, in order to take effect, must be accepted by the applicant with its conditions.    To induce or compel the holders of existing property of this kind whose charters are repealed to come under the act, the latter declares such property a nuisance, forbids its use, and imposes penalties.    The charters so obtained through the *Railroad Commission* are for a limited time, at the end of which some third person, or a municipality, or the state, is, by reason of the conditions acceded to and upon a described measure of compensation, to become by condemnation the owner of all such property.    There are several hundred charters enacted by former legislatures of this state and of the preceding territorial government authorizing the building of dams in the navigable waters of this state in aid of navigation, and most of these have been accepted by construction of the required works in aid of navigation.

The pleadings present that relators are property owners whose property is threatened by this act with destruction or confiscation, and placed without the protection of law by declaration that it is a public nuisance and the imposition of penalties for using the same.    This is a private wrong calling for the interposition of equity *quia timet*.    The pleadings also show that all improvements to navigation recognized by former statutes as such and so recognized in the statute in question, and made in all the navigable rivers in the state within the last sixty or seventy years and now existing, are threatened with abatement and destruction and their up-keep and use penalized except upon conditions charged to be invalid and unenforceable.    This is a threatened public wrong affecting the sovereignty and prerogatives of the state and calling for redress by injunction.    *Att'y Gen. v. Eau Claire,* 37 Wis. 400; *State v. Eau Claire,* 40 Wis. 533.    There may be other grounds for the exercise of original jurisdiction and other questions *publici juris* in the case, but the foregoing is sufficient.    There cannot be much doubt of this as regards the de-

fendants constituting the *Railroad Commission,* and as to the other defendants the question is closed by *State ex rel. Bolens v. Frear, post,* p. 456, 134 N. W. 673, 135 N. W. 164.

We approach the grave questions involved with the utmost deference to the co-ordinate branches of government which have passed upon the same. We shall treat the enactment as a measure in aid and regulation of navigation as it purports to be, and, except where convinced beyond a reasonable doubt to the contrary, shall hold its requirements constitutional and valid. We shall not attempt to define the extent or set the limits of the reserved right of repeal contained in the constitution of this state (sec. 1, art. XI) or in a charter further than to say that such power does not authorize the confiscation or destruction of property or its taking without just compensation. It is to be construed like all constitutional provisions to harmonize with other commands and restrictions of the same instrument, and it must always yield to that paramount provision of the federal constitution which forbids the state to deprive any person of life, liberty, or property without due process of law and to the substantial equivalent of the latter in our state constitution. Sec. 9, art. I; *Janesville v. Carpenter,* 77 Wis. 288, 46 N. W. 128; *State ex rel. Kellogg v. Currens,* 111 Wis. 431, 435, 87 N. W. 561; *Adirondack R. Co. v. New York,* 176 U. S. 335, 20 Sup. Ct. 460; *People ex rel. Schurz v. Cook,* 148 U. S. 397, 13 Sup. Ct. 645; *Pearsall v. G. N. R. Co.* 161 U. S. 646, 16 Sup. Ct. 705; *Bank of Commerce v. Tennessee,* 163 U. S. 416, 16 Sup. Ct. 1113; *Shields v. Ohio,* 95 U. S. 319; *Greenwood v. Freight Co.* 105 U. S. 13; *Wilmington City R. Co. v. Wilmington & B. S. R. Co.* 1 Del. Ch. App. 468, 46 Atl. 12. We may now take up for analysis the details of the act in question.

Sec. 1596 as amended extends somewhat the former statutory description of what streams are navigable, forbids obstructions therein, declares dams, bridges, or other obstructions maintained in violation of this section to be public nui-

sances, provides for their abatement, and imposes penalties. It is general in its terms and within well recognized legislative power, and has little or no connection with what follows. We hold this section to be prospective so far as it refers to streams not theretofore within the purview of the section it purports to amend, and to affect only dams in such streams placed there after the amended statute went into effect. It need not be further noticed. Sec. 1596a forbids any person, etc., to "conduct or maintain or operate or use any dam or other improvements in or across" any navigable stream without having, holding, or obtaining a franchise from the state authorizing the construction or maintenance and operation of such dam or improvements. Paragraph 2 of this section declares any dam or improvements constructed or maintained in violation of sec. 1596a to be a public nuisance. We note the broad language of this prohibition forbidding the maintenance, operation, or use of either the dam or other improvements without a franchise. We are not left in doubt as to the meaning of the word *franchise.* "Franchise" as used in this act is there defined to mean a grant of authority under the provisions of this act, not a prior existing franchise. Sec. 5, par. 3.

"Improvements" is defined in the act to mean the dam itself and all weirs, tunnels, races, flumes, sluices, pits, locks, chutes, boat hoists, marine railways, fishways, and other structures, machines, and devices necessary or essential for the development of hydraulic power and for the generation of mechanical energy or electrical energy, or both, constructed within or made part of such dam or dams. This word in the act also means such machines, connections, regulations, and transmission devices as may be found by the *Railroad Commission* to be necessary for the utilization of energy in connection with the proposed improvement. It also includes all reservoir, flowage, and other rights and easements and all lands necessary and used under such franchise for the main-

tenance of such dam or dams and the structures and devices above enumerated. Sec. 5, par. 6. We notice, in passing, the sweeping language of this paragraph and that none of the things there enumerated and described may be used, and that in the absence of the franchise under this act all are declared to constitute a public nuisance. It is further provided in sec. 1596a that either the construction of any such dam or "improvements" or their maintenance may be abated at the suit of the state or of any private citizen. Sec. 1 declares that the use of navigable waters for power developed under a franchise "granted under the provisions of this act" is a public use, thus attempting to give the use under the franchise that effect. Secs. 2, 3, and 4 are to the effect that all energy, developed or undeveloped, of the navigable waters of the state is subject to the control of the state for public good, and that the beneficial use and natural energy of the navigable waters of this state for all public uses are held by the state in trust for all of the people and that the state reserves the management, control, etc. It is contended by the relators that secs. 2, 3, and 4 amount to an assumption of proprietorship of the energy of falling water on the part of the state; but counsel for defendants, including the senator who introduced the bill in question, contend that no such meaning can be given to these sections and that they only assert the possession by the state of the power to regulate the production of such energy in and from navigable waters and the instruments of such production. These provisions seem fairly capable of the latter meaning, and under our duty to uphold the law if this can be done we must give them such meaning as is required for their support and validity. We need say no more concerning secs. 2, 3, and 4, regarding them merely as declaratory of sovereign power in a somewhat general declamatory way. Sec. 6 provides that every franchise granted under the provisions of this act shall be granted for the purpose of improving the navigation of navigable waters, and shall include the right to construct and maintain dams or

improvements therein for said purpose, or for said purpose and other lawful purposes, and shall include the right to utilize under the terms, conditions, and provisions of the act any hydraulic power created and developed by virtue of the improvements, and every such franchise *shall contain and embrace all the terms, provisions, and conditions of the act.* This requirement is industriously repeated in varying forms of expression. It is found in paragraph 2 of sec. 24, which purports to extend, upon application of the owner, repealed franchises. "A franchise therefor, subject to all the terms, conditions, and provisions of this act, is hereby granted to such applicant." It is found in sec. 28, and there appears one of these "terms and conditions" to the effect that at the termination of any franchise granted under the provisions of this act by expiration, forfeiture, *repeal, or otherwise* the improvements erected, maintained, held, enjoyed, and used and useful in connection with the improvement, may be taken by any appropriator by condemnation proceedings, and the retiring appropriator in accepting the franchise will be deemed to have agreed that this appropriator may do so by paying just compensation. But just compensation shall not include the full value at the time taken, but only the value at the time the franchise under this act was granted, if the riparian owned the land or the land and improvements when he applied for the franchise. Also that no allowance shall be made for the franchise or any rights or privileges included therein. Sec. 29 provides that no franchise granted pursuant to the provisions of this act shall become effective and be in force unless within ninety days after notice from the *Railroad Commission* that the same has been granted the applicant shall file with the *Railroad Commission* a written acceptance thereof. Sec. 30 requires as one of the terms and conditions of the act that the franchise granted thereunder shall be for a term of twenty years only, but the appropriator or successors or assigns shall have a right of continuance of the same

for two further and successive terms of ten years each. Sec. 33 provides that every franchise granted under the provisions of this act is accepted, taken, and held subject to all the terms, conditions, and provisions of such franchise and of this act, and is so accepted, taken, and held in consideration of the powers, privileges, and prerogatives conferred by said franchise. Sec. 36 provides for the payment of an annual franchise fee which the acceptor must consent to. Sec. 37 provides for a forfeiture of the franchise for nonpayment. Sec. 38, that the state shall have a preferred lien, second only to the lien of taxes, to secure this franchise fee. Sec. 41 provides that every franchise granted under the provisions of this act is subject to the express condition that the state, when it shall have the constitutional power, may at the termination of the twenty- or either ten-year period acquire by purchase, lease, or condemnation all improvements, etc., upon the same basis of valuation as a municipality. Sec. 42 provides that at the end of either such period any municipality may acquire any improvements constructed and maintained by any appropriator under such franchise, compensation for such improvements to be determined by the *Railroad Commission;* and then the following:

"Any appropriator by the acceptance of a franchise granted under the provisions of this act shall be deemed, by the acceptance thereof, to have agreed that any municipality or the state may acquire all dams and improvements acquired, erected, and maintained or used or useful under the franchise of said appropriator by paying just compensation therefor, and that in determining such just compensation no allowance shall be made to such appropriator for any increase in the value of any lands acquired or used or useful under such franchise, over and above the value of such lands at the time of the granting of such franchise, if the same were previously acquired, or at the time of acquisition, if the same were acquired subsequent to the granting of such franchise, and that no allowance shall be made for such franchise *or any rights or privileges included therein.*"

Sec. 26 imposes a penalty of $50 per day for any exercise or attempted exercise of any power, rights, or privileges under any repealed charter. The owner of any dam who has constructed the same in aid of navigation under authority from the legislature of this state by this act which recognizes that his dam is still an aid to navigation because it offers him a charter to maintain it for that purpose, must either submit to be deprived of the use of the property described under the term "improvements" and to have this property, including the dam and the riparian land, declared a public nuisance out of the protection of the law and liable to abatement, or agree to the foregoing conditions as well as some others not specially mentioned herein. We may, however, note that by sec. 1, taken with the other sections above referred to (in addition to other concessions), the water-power proprietor by accepting this new charter consents that his property shall become impressed with a public use. / In short, the statute in these respects is equivalent to a statute declaring the dam a public nuisance and its maintenance or use a misdemeanor, unless the owner pays to the state an annual franchise fee and surrenders his fee simple estate for a limited or terminable fee and agrees that his property be impressed with a public use and that it may be taken by an "appropriator," by a municipality, or by the state at less than the just compensation which the constitution secures to others, and consents to all the other requirements of the act. If he make these payments and concessions and yield up these property rights, his property will continue as it was, a lawful structure and an aid to navigation, otherwise not. /

Here we may consider sec. 23.

"Every license, permit, or franchise authorizing the erection and maintenance of any dam in or across any navigable stream, heretofore granted and which by the terms thereof or otherwise is subject to repeal, is hereby repealed, such repeal to take effect and be in force six months after the passage and publication of this act."

In order to get the full force and effect of this we must take a glance at conditions to which it is made applicable. During the whole past life of this state and prior to its existence the policy of the legislature, truly representing public sentiment in that respect, was to freely grant charters for the erection of dams in the navigable rivers of the state in aid of navigation. The legislature granted the charter in consideration that the grantee would make the improvement in aid of navigation; the latter accepted the offer and invested thousands of dollars in making the improvement; not as a philanthropist or because he desired to expend money in aid of navigation, but in order to acquire for himself the valuable water power thus produced or increased. The legislature understood and approved this purpose and this consequence. In the judgment of the legislature the navigation was improved, and this was the consideration received by the state. A water power was created or improved, and the ownership of this was the consideration received by the grantee. Such policy was also considered essential to the settlement of the state and the development of its property resources. By contract with the state, therefore, the riparian owner bought and paid for this valuable property right so far as the state had power to grant it. He had also acquired by purchase the riparian right hereinafter referred to. These two in combination caused or created the water power. These property rights so created increased in number and value until the present time when there are hundreds of such dams and millions of dollars invested therein. Manufacturing industries operated by such water powers were established, and here further investments made and rights acquired. Villages and cities sprung up and clustered around such factories. New riparian rights arose and vested in these landowners or lotowners abutting on the raised water above the dam, and the erstwhile overflowed land below the dam was bought, built upon, and improved; the watercourse acquired new banks and boundaries; all such conditions ad-

justing themselves to the improvement. These factories and their concomitant villages and cities furnished labor and a livelihood to thousands of artisans and a market for thousands of farmers. Titles and values became dependent on the continuance of the conditions thus created. In the years that elapsed those holding and acting on such beliefs invested their savings, reared and educated their children, and the latter inherited the property and pursued the honorable avocations of their parents, or by good fortune or special ability rose in some other walk of life, or entered the learned professions, or became themselves *entrepreneurs* and acquired and owned in whole or in part or operated the same or other similar water powers. As a result of this material progress the year 1910 found this state with two and one-third million of population, owning more than two and one-half billion dollars worth of taxable property and having two hundred fifty-eight million dollars deposited in banks and six million dollars in trust companies within the state. Under such conditions the creation and vesting of many property rights depending upon the continuance of such improvements was inevitable. Industry and self-denial were stimulated and rewarded by the acquisition of property, and the property rights of the people thus acquired secured to them by laws. Paramount among these laws was the constitutional command that private property should not be taken for public use without just compensation, and by necessary inference that it should not be taken for private use at all. There was also the command of the federal constitution, harking back to Magna Carta, that no person should be deprived of his property without due process of law or denied the equal protection of the laws. The charters granted by the state during the period referred to may be classified as follows: First, those granted to natural persons and complied with by the latter, reserving no right of repeal. These, by all the authorities, constitute a contract not subject to repeal at the pleasure of the state. Second, those granted

with or without such reserved power of repeal and never accepted or complied with. These are subject to repeal or ouster by *quo warranto*. Third, those granted to natural persons, reserving in the charter the power of repeal, and those granted to corporations, both accepted by complying therewith in constructing the aids to navigation required. As to this third class, assuming that they are meant to be covered by sec. 23 of the act, we have not merely a repeal but a confiscation of property, taking all the provisions of the act together. The state still continues to use the improvement. It recognizes that it is still an aid to navigation. The improvement performs its office of holding back the flood as before, and if it ever was a public benefit it is by the lapse of time more so at present. It is, however, declared a public nuisance, but permitted to remain and do its work, and the state offers its aid by delegation of the sovereign power of eminent domain to any third person to acquire this property from the first owner and immediately the ban is removed. That which was temporarily and nominally a public nuisance becomes again, without any change in its physical condition, a lawful structure, and it resumes its original status as an aid to navigation and entitled to the protection of the law. But the appropriator may not appear for years. There is no certainty that he or it will ever come. The first owner is to have compensation for his property only in case this appropriator turns up. In the meantime the property is put without the protection of law and its use declared a misdemeanor. Such provision for compensation is invalid within the rule of *Powers v. Bears,* 12 Wis. 213; *Shepardson v. M. & B. R. Co.* 6 Wis. 605, and cases cited in 15 Cyc. 642, note 65. We may say here, therefore, that there is no provision for compensation, because such inadequate and invalid provision is equivalent to none at all. But the act not only purports to repeal the charter but to take the property, because the state not only permits it to remain, performing its former function as an

aid to navigation, but undertakes to sell or grant the use of it
for a consideration to any third person who will accede to the
state's terms.   The legislature in the exercise of its power of
regulation or police power may within certain limits declare
what acts shall constitute a nuisance, but this power cannot
be made a cloak for confiscation.   "The legislature has no
right arbitrarily to declare that a nuisance which in fact is
not so."   *Lawton v. Steele,* 152 U. S. 133, 14 Sup. Ct. 499,
and cases; *Priewe v. Wis. S. L. & I. Co.* 93 Wis. 534, 67 N.
W. 918.   The legislature, therefore, has no such power over
private property in the lawful enjoyment of some person as
to declare it a nuisance and make its use a misdemeanor with-
out providing compensation to the owner.   *Wynehamer v.
People,* 13 N. Y. 378 *et seq.*   The state has power in aid of
navigation to regulate the use of the navigable waters and to
authorize such improvements in aid of navigation, and all in-
corporeal riparian rights and all rights of the riparian owner
in and to the bed of the stream are subject and subordinate to
this power of the state.   So are these rights, like all other
property rights, subject to state regulation to a degree com-
mensurate with the nature of the property, its dangerous or
its semi-public character, or any other peculiar character or
quality it may possess requiring greater or less regulation.
All the police power of the state is applicable to such prop-
erty and the enjoyment thereof.   But such incorporeal ri-
parian rights are not, as against the riparian owner, subject
or subordinate to any salable or demisable right of the state,
or to any claim of the state for compensation therefor, or to
any grant of the state to a third person for the purpose of
manufacturing or of using or selling water power.   They
may be taken for the latter uses when such uses are public, but
only upon compensation.   The improvement of navigation
being in itself lawful, the riparian owner can recover for no
consequential damages flowing therefrom.   *Black River Imp.
Co. v. La Crosse B. & T. Co.* 54 Wis. 659, 11 N. W. 443.

But even the right of navigation or the improvement of the navigable waters for navigation purposes will not justify the taking of the bank without compensation to the owner. *Cohn v. Wausau B. Co.* 47 Wis. 314, 322, 2 N. W. 546; *Pumpelly v. Green Bay Co.* 13 Wall. 166, and cases in Rose's Notes. The questions here presented more directly relate to taking property for a private purpose without compensation and not in aid of navigation. The interest of navigation is not affected by the ownership of the resulting water power. We consider that declaring the property a nuisance and penalizing its use is a taking within the meaning of the constitution, and that the alternative provided in this act, by which the owner may escape this taking by consenting that his private property be impressed with a public use by surrendering up to the state his property, or some interest therein, or part of his right to compensation, or his ownership of the water power, or his privilege to continue his property in its advantageous condition so long as it is a lawful aid to navigation until the state takes it for a public use on making compensation, is but another form of taking his property. *Wilmington City R. Co. v. Wilmington & B. S. R. Co.* 1 Del. Ch. App. 468, 518, 46 Atl. 12. "Sheer oppression and wrong cannot be inflicted under the guise of amendment or alteration." *Shields v. Ohio,* 95 U. S. 319; *Greenwood v. Freight Co.* 105 U. S. 13. Whatever property is acquired under such a charter prior to its repeal is held under the same guaranties which protect other property. *County of Santa Clara v. S. Pac. R. Co.* 18 Fed. 385; *Lothrop v. Stedman,* 42 Conn. 583; *Comm'rs v. Holyoke W. P. Co.* 104 Mass. 446. We may also cite, without committing this court to everything contained therein, *People v. O'Brien,* 111 N. Y. 1. Other provisions of that act apply not only to those riparian owners who under a charter have constructed a dam, but to riparian owners who as yet have neither charter nor dam. Sec. 8 authorizes any person, firm, domestic corporation, or municipality, whether a ripa-

rian owner or not, to apply to the *Railroad Commission* for a franchise.    When he makes his application he is by par. 4 of sec. 5 the applicant; after he receives it he is by par. 5 of sec. 5 the appropriator.    The significance of these statutory definitions must not be overlooked, because the word "appropriator" is often used in other portions of the act, and certain rights and powers conferred upon and certain duties imposed upon the "appropriator."    A hearing before the *Railroad Commission* is provided.    Where it appears to that body by evidence that the proposed improvement will result in the improvement of navigation, that all dams and other improvements proposed will be adequate and will not endanger health, life, or property, and that the interests of the public will be better served by the construction, etc., of such improvement, and, if its purpose be to develop hydraulic power, that the same will result in the efficient development thereof, the *Railroad Commission* shall so find and the applicant is entitled to a franchise.    If they find the contrary he is not entitled to a franchise.    Having such authority flowing from the statute, acting upon the findings of the *Railroad Commission,* he becomes and is an appropriator, and is subject to all the conditions hereinbefore. mentioned.    This appropriator has the right of taking the land of any riparian owner and all the appurtenances of such land and all riparian rights belonging to such land for the purpose of constructing the dam authorized by statute.    Upon this person receiving this franchise is conferred, by sec. 7, the right to utilize for any lawful purpose any hydraulic power created or developed by virtue of any improvement authorized by any franchise.    Any person not a riparian owner may also apply for a franchise where another person whose charter or license has been repealed by the act fails to apply within the time specified in the act, and in either case either of these persons may exercise the power of eminent domain and condemn the riparian's property with all its appurtenances but without improvements in the first case, and with its improvements and

appurtenances in the second.   Secs. 25, 28, and 46.   This
person so authorized to invoke the state power of eminent do-
main and institute and carry out the condemnation proceed-
ings, should he develop hydraulic power under the franchise,
is authorized and required to lease or dispose of such power
and any electrical energy derived therefrom to the public
without discrimination and at a reasonable rate; "however,
said appropriator may retain and use as much of said hy-
draulic power and electrical energy as shall be reasonably
necessary for its own purpose or purposes."   Sec. 51.   If
public convenience and necessity require it he shall develop
all the hydraulic power created by such dam and transform
any or all of such power not reasonably necessary for the pur-
pose or purposes of said appropriator into electrical energy,
and shall transmit the same, *or such part thereof as is not rea-
sonably necessary for the purpose or purposes of such appropri-
ator,* for sale to the public.   This purports to authorize the
taking of the land of a riparian owner, unimproved or im-
proved, by one not a riparian owner, who has the right to em-
ploy all or part of the most valuable use of such land to his
own private purposes.   It is quite a different thing to impose
upon a corporation to which the power of eminent domain is
delegated public duties (*Wis. River Imp. Co. v. Pier,* 137
Wis. 325, 118 N. W. 857) and to declare that a given use for
the benefit of the owner of property is a public use.   This
last is what the legislature attempted to do here.   If the legis-
lature could, by mere fiat, make any use of property a public
use, all private property could in this way be subjected to
these drastic regulations justified by a public use.   "All the
courts, we believe, concur in holding that whether a particu-
lar use is public or not, within the meaning of the constitution,
is a question for the judiciary."   *Wis. W. Co. v. Winans,* 85
Wis. 26, 40, 54 N. W. 1003, citing Lewis, Eminent Domain,
§ 158; *Talbot v. Hudson,* 16 Gray, 417; and other cases.
The use of water power by a manufacturer for his own pur-

poses is a private use and is not on the basis of a sale of power
to the public.     This part of the act therefore falls.

The right of the riparian owner to use the water of the river
on his own land within his boundary determined by ordinary
high-water mark, for the purpose of creating power or, as the
act in question puts it, "developing energy," returning the
water again to the stream, is unquestionably a private right
appurtenant to the riparian land.     The idea of a legal owner-
ship of the "energy" of falling water by one who owns neither
the water which falls nor the land the declivity of which
causes the fall has been analyzed and criticised by counsel for
relators.     But counsel for defendants disclaim any such mean-
ing for the statute in question, no doubt finding a different
position, in their opinion, untenable. · It is conceded there is
such a riparian right as the right to use the water for power,
and also that this right is to be exercised in subordination to
the public right of navigation and the necessary accessories of
the latter.     We say that if the exercise of this riparian right,
in the judgment of the legislature, interferes with the public
right of navigation, it may be forbidden.     But as has been
said by Judge COOLEY in *Middleton v. Flat River B. Co.* 27
Mich. 533 : "Each right should be enjoyed with due regard
to the existence and protection of the other."     Or, as he says
in *Buchanan v. Grand River & G. L. R. Co.* 48 Mich. 364,
367, 12 N. W. 490 : "Each right modifies the other and may
perhaps render it less valuable, but this fact, if the enjoyment
of the right is in itself reasonable and considerate, can fur-
nish no ground for complaint."     Where the ownership of the
bank is essential to the construction of a dam or the creation
or development of a water power, the state is as helpless to use,
sell, or lease such right without condemnation and compensa-
tion as the riparian owner is to intrude into the navigable
stream without consent of the state.     It requires the concur-
rence of the riparian owner and the state in such case to make
the water power efficient, and this right of the riparian owner

to refuse to concur and stand out for compensation, in the case mentioned, is a private property right and often gives to such land its chief value. The state may refuse its permission to the riparian owner to build a dam and may attach conditions to its consent, such as the height, strength, mode of construction, etc., of the dam, and perhaps other conditions, but it may not seize upon this right without compensation and use it or sell it or lease it to another. It cannot authorize the use and enjoyment of this right by a person not a riparian owner for a private purpose without the consent of the riparian owner, nor for a public purpose without condemnation and compensation to the riparian owner. This principle runs through all the cases. *Green Bay & M. C. Co. v. Kaukauna W. P. Co.* 70 Wis. 635, 35 N. W. 529, 36 N. W. 828; *Koenig v. Watertown,* 104 Wis. 409, 80 N. W. 728; *West v. Fox River P. Co.* 82 Wis. 647, 52 N. W. 803; *Fox River F. & P. Co. v. Kelley,* 70 Wis. 287, 35 N. W. 744; *Kaukauna W. P. Co. v. Green Bay & M. C. Co.* 75 Wis. 385, 44 N. W. 638; *A. C. Conn Co. v. Little Suamico L. Mfg. Co.* 74 Wis. 652, 43 N. W. 660; *Wis. River Imp. Co. v. Pier,* 137 Wis. 325, 118 N. W. 857. Many other cases will be found cited in the briefs of counsel for relators. These premises support the conclusion that the act in question attempts to deprive the owners of improved riparian land and of the resulting water power, and owners of unimproved riparian land with its appurtenant water-power privileges and advantages, of property without due process of law; that it attempts to authorize the taking of private property for private purposes; and that it attempts to take property without just compensation. The act in question, in the particulars mentioned, is inconsistent with the paramount commands of the state and of the federal constitution applicable to the same facts and conditions. Hence we cannot recognize it as law. We must faithfully observe and give force to those constitutional restrictions upon the legislative power, which we have not the slightest doubt

apply in the instant case. It is contended that the statute may be sustained in part, and the legislature seems to have had some misgivings concerning the constitutionality of portions of the act, because it is therein declared that secs. 1, 2, 3, 23, and 73 are to be considered separable or independent portions thereof, and that any one or all of said sections may fail or be declared invalid without affecting any other section or sections of the act. Also that it was the further intention of the legislature that if any other separable or independent portion of the act, not necessary for the accomplishment of the main purpose sought to be accomplished thereby, fails, the remainder of said act should not be affected by the failure of such separable or independent portion. This may be some indication of legislative intention, but we regard it as merely declaratory of the rules heretofore laid down by this court on the same subject and which are rules of constitutional law. What is the main purpose of the act? Manifestly to establish a new system, by which the granting of charters for dams should be referred to the *Railroad Commission* for findings, the construction, regulation, and up-keep thereof subject to the authority of that *Commission,* and that the state should from henceforth exact a franchise fee, and that all should be coerced to come in under this act and consent to the conditions of the new charter, and that the public, either a municipality or the state, should finally succeed to the ownership of all water powers of the state. Sec. 1596 is not necessary to the accomplishment of this main purpose. But all the rest of the act appears to be. The *Commission* is not authorized to act, except with reference to the granting of a charter containing conditions here held invalid; their powers of administration and supervision come into force and are dependent upon the confiscatory features of the act. Their acts have the legal effect given to them by this invalid statute or no effect. Neither the appropriator nor the municipality nor the state can take the property as herein provided. The terms of the

new charter cannot be enforced, and the outlawry of the property and the penalties are invalid. There is nothing left but a confused detail of incoherent provisions. In order for part of an act to be upheld as separable it is essential that such part found to be within the constitutional power of the legislature forms, independently of the invalid part, a complete law in some reasonable aspect, so that it may fairly be concluded that the legislature would have enacted the same without the invalid portions. When a legislative enactment has an all-pervading purpose coupled with minor details and administrative features and this purpose is unconstitutional, such minor details and administrative features cannot survive condemnation of the main purpose.

All the features of this act, aside from those specifically mentioned, are mere details or administrative features of the act. Thus the all-pervading necessary effect of such chapter is to take property which is in fact private, for a purpose declared to be public, without rendering any compensation therefor. The necessary effect, if enforced,—and so the purpose in a legal sense,—of ch. 652, Laws of 1911, being state appropriation of the private property rights of riparian proprietors owning the banks of navigable rivers, in a manner not warranted by the fundamental law, and those portions of the act which do not directly deal with the assertion of state title, being merely features designed to render such assertion efficacious, it all forms an inseparable and an unconstitutional entirety.

*By the Court.*—A writ of injunction is awarded restraining the defendants from acting under or attempting to enforce the provisions of this act except sec. 1596 thereof.

KERWIN and BARNES, JJ., took no part.